**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

DEBORAH LAUBSCHER and
ROBERT LAUBSCHER, as surviving
parents of DANI LAUBSCHER,

      Plaintiff,

          v.

GWINNETT COUNTY,

      Defendant.

Civil Action File No.:

**JURY TRIAL DEMANDED**

**COMPLAINT**

1.     The Laubscher family alleges that Gwinnett County unlawfully discriminated against Dani Laubscher based on mental illness in egregious and overlapping ways that led to their needless and tragic death.

2.     Defendant's response to a mother's call for help reported as a "psych suicide" ended with a Gwinnett County Police Department officer shooting Dani Laubscher while they were on the ground, on their back, in their home, with taser prongs lodged in their body.

3.     Defendant's actions flowed foreseeably and inevitably from its systemic failure to consider mental health incidents as medical events requiring a medical response, the failure of the county to provide for timely medical responses to mental health emergencies, GCPD's gross lack of

training in crisis intervention that made it an outlier compared to peer jurisdictions, the inadequacy of GCPD's written policies, the failure to employ the very basics of de-escalation or effective communication, and the failure to take action in response to repeated warnings.

4.     When Defendant's personnel responded to Dani Laubscher's emergency, Dani did not appear to be imminently suicidal. But Defendant's failures ensured that the worst-case scenario came to pass. Gwinnett County killed Dani because it ignored their need for help, failed to accommodate their disability, and discriminated against them based on their disability.

5.     Dani's parents bring this lawsuit to seek accountability for Gwinnett County's violations of Dani's rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

## JURISDICTION AND VENUE

6.     This case is brought pursuant to Title II of the ADA, 42 U.S.C. § 12131, *et seq,* and Section 504 of the Rehabilitation Act, and 29 U.S.C. § 794, *et seq.*

7.     This Court has jurisdiction of federal claims under 28 U.S.C. §§ 1331 and 1343.

8.     Plaintiffs seek monetary damages, attorney fees, and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a and 42 U.S.C. §12133.

9.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims arose in this district and division.

## PARTIES

10.     Plaintiffs Deborah Laubscher and Robert Laubscher are the parents of the late Jonathan "Dani" Laubscher. Deborah and Robert are the surviving parents and next of kin to Jonathan "Dani" Laubscher.

11.      Jonathan Daniel Laubscher was 28 years old when they were killed by a Gwinnett officer. Their family generally refers to them as Dani and using they/them pronouns. Counsel will endeavor to do the same.

12.     Defendant Gwinnett County, Georgia is a political subdivision of the State of Georgia and is amenable to suit and subject to personal jurisdiction in this Court. Defendant operates the Gwinnett County Police Department ("GCPD").

## LEGAL FRAMEWORK

13.     In 1990, Congress enacted the ADA—a landmark civil rights law—"to provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities." 42 U.S.C. 12101(b)(1). The ADA has been described as "a milestone on the path to a more decent, tolerant, progressive society." *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring).

14.     Title II of the ADA prescribes that no individual with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

15.     The ADA defines "public entity" to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local governments." 42 U.S.C. § 12131(1)(A) and (B). By its plain terms, the ADA applies to law enforcement agencies. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (ADA uses the term "any" in its ordinary "expansive" sense); *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998) (ADA contains no "exception that could cast the coverage of" law enforcement entities "into doubt").

16.    Congress contemplated that Title II would apply to law enforcement operations. The House Report specified that Title II's anti-discrimination provision would "extend . . . to all actions of the state and local governments." H.R. Rep. No. 485, 101st Cong., 2d Sess. Pt. 2, at 84 (1990) (emphasis added). The report further singled out arrests as an example of an activity where "discriminatory treatment based on disability can be avoided by proper training." Id. Pt. 3, at 50. In addition, legislators emphasized that Title II would address discrimination in law enforcement, including arrests of individuals with disabilities. *See, e.g.*, 136 Cong. Rec. 11,461 (1990) ("Many times, deaf persons who are arrested are put in handcuffs. But many deaf persons who are arrested use their hands to communicate. . . . These mistakes . . . constitute discrimination."); *id*. at E1913, E1916 (daily ed. June 3, 1990) ("[P]ersons who have epilepsy are sometimes inappropriately arrested because police officers have not received proper training to recognize seizures and to respond to them.").

17.    Because law enforcement entities are subject to Title II, they must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). That requirement extends to the arrest of an individual with a disability. In the context of a person with a known

psychiatric disability who is in crisis, the ADA requires that police employ widely accepted policing practices that use containment, coordination, communication, and time to seek safe resolutions. In other words, "[i]ncluding individuals with disabilities among people who count in composing 'We the People,' Congress understood . . . would sometimes require not blindfolded equality, but responsiveness to difference; not indifference, but accommodation." *Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsberg, J., concurring).

18.     Section 504 of the Rehabilitation Act applies to public entities that receive "Federal financial assistance." 29 U.S.C. § 794(a). Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." *Id*. In regard to claims of police misconduct, Title II has been held to be similar in substance to the Rehabilitation Act. In addition, the ADA provides that the "remedies, procedures, and rights" of the Rehabilitation Act "shall be the remedies, procedures, and rights" provided to plaintiffs under the ADA. 42 U.S.C. § 12133.

19.    Gwinnett County, Gwinnett County's emergency call center, and the GCPD receive federal financial assistance, and thus Section 504 of the Rehabilitation Act applies to them.

## FACTUAL BACKGROUND

### *Dani Laubscher*

20.    Dani was a creator: a writer, a musician, a visual artist. They created poetry, made music since they were a kid in church and on into their adulthood, scored a film, painted, and made album covers.



21.     Dani was a comforter: they rescued cats, delivered organic vegetables, gave gentle hugs, listened when you spoke, made their (English) mother cups of tea, provided guidance in sorrow, gifted more thoughtfully than others, inspired uncontrolled laughter, and sent "I love you" messages hundreds of times. Dani's motto was "do no harm."

 

22.     Dani loved the natural world: they took long walks, talked on park benches, and biked. They gathered strength in weathering nature's storms. They found inspiration in moments others might neglect like the play of the sun's light in a tree at dusk.



23.     Dani was the family's youngest child and sibling.



24.     Dani was fiercely loyal and devoted to their family, even as their life grew difficult.



25.    Dani should still be alive today.



26.    Dani would be alive but-for Defendant Gwinnett County's discrimination on the basis of disability status and failures to accommodate.

27.    As Dani grew into adulthood, they began to experience symptoms of mental illness. They were diagnosed with schizoaffective disorder.

28.    As a result of their illness, sometimes Dani was plagued by moments of depression, paranoia, and suicidal thoughts.

29.    In other moments, Dani experienced profound joy, euphoria, and peaceful contentment.

30.     Dani and their family worked so that they would have treatment for their illness. Dani saw the same psychiatrist for over ten years.

31.     Dani's family attended training for the parents of children with mental illness.

32.     Dani and their family were ever hopeful that they would launch into a happy, healthy adulthood.

33.     Dani's family also acknowledged that Dani needed further help. At one point, they applied to be Dani's legal guardians so that they could obtain a higher level of care. But these papers were stuck in probate and never went through.

### *Deborah Laubscher Calls Defendant for Help*

34.     On the day they were killed, Dani was living in their parents' house in Duluth.

35.     Dani's mother, Deborah, was a retired nurse and would talk with Dani about taking medication.

36.     That afternoon Dani made a cup of tea for Deborah.

37.     Dani's behavior became erratic. Deborah was concerned that they were not taking their prescribed medications and may have taken other drugs.

38.     However, per the medical examiner and GBI testing, it appears that the only drugs in Dani's system were those that were prescribed for mental illness.

39.     Deborah was concerned that Dani might engage in self harm.

40.     Deborah called 911 asking for a crisis intervention team.

41.     Deborah had called for a crisis intervention team to help Dani in the past.

42.     When the crisis intervention team had arrived in the past, they spoke with Dani and determined that Dani did not meet the criteria for 1013, and after some time talking with Dani and Deborah, they left.

43.     In other words, Defendant Gwinnett County would only take any action in response to someone experiencing repeated mental health crises was if they were so psychotic as to pose an imminent risk of serious harm to self or others.

44.     Gwinnett personnel were obligated to refer persons, like Dani Laubscher, who would benefit from behavioral health services and support and who repeatedly called for emergency services to private mental health providers.

45.     Gwinnett personnel failed to do so.

46.     Deborah's objective in calling 911 for a crisis intervention team was that Dani be safe despite their transient lack of judgment.

### Gwinnett's Personnel Were Aware of Dani's Disability

47.     Deborah told dispatch that Dani was experiencing a mental health crisis and that they had not hurt anyone.

48.     Dispatch told Gwinnett personnel who responded to the scene that this was a "psych suicide" call.

49.     Deborah had called for mental health emergency services at least three times in the recent past to be dispatched to the home. Each time was resolved without incident.

50.     Dispatch should have, but did not, convey this information to Gwinnett personnel that responded.

51.     Deborah told Gwinnett personnel face to face that Dani was psychotic and she believed they may have been unmedicated.

52.     Gwinnett personnel observed that Dani was experiencing a mental health crisis, was behaving erratically, and was unable to effectively communicate or immediately follow yelled commands.

53.     Gwinnett personnel had no doubt that Dani was a person suffering from a mental health disability.

54.      Dani Laubscher's behavior was the result of their mental illness.

55.     Toxicology reports would later confirm that they were not under the influence of any drugs, other than those prescribed for treatment of mental illness.

### As a Matter of Policy, Gwinnett Sent Police, Not Medical Personnel, to Suicide and Mental Health Crisis Calls

56.     Suicide, or any attempt, is not a crime. *See Teel v. Lozada*, 826 F. App'x 880, 886 (11th Cir. 2020); *Broomall v. State*, 391 S.E.2d 918 (Ga. 1990) ("[S]uicide is not a crime in Georgia.").

57.     A person experiencing a mental health crisis leading to suicidal ideation or action is a medical emergency that requires a medical response.

58.     Defendant's emergency dispatch system receives multiple calls every day for suicide, resulting in hundreds of calls per month.

59.     It was routine for the emergency dispatch system to receive more than 10 calls about suicide on a single day.

60.     Defendant's emergency dispatch system systematically undercounts suicide calls, including in this instance.

61.     As a matter of course, Defendant does not respond by sending appropriate medical personnel, like it does for heart attacks, strokes, collisions, and other serious medical emergencies.

62.     Instead, Defendant sends the police to these calls.

### *Gwinnett's Response Policies Unlawfully Prioritized Physical Health Over Mental Health by Sending Ineffective Responders to Mental Health Emergencies Only*

63.    Gwinnett's response policy improperly responds to mental health emergencies as a matter of course by sending police officers, rather than mental health clinicians or other health care providers.

64.    In contrast, physical health emergencies, such as heart attacks and strokes, are treated by sending emergency medical workers.

65.    Gwinnett's response policies of sending police response teams to mental health emergencies that are unfit to offer medical services, while sending adequate medical services to physical health emergencies, unfairly discriminates against Gwinnett residents who suffer from mental health emergencies.

66.    Gwinnett officials, including Gwinnett County Police Department leadership and the Gwinnet Board of Commissioners were aware of the different responses for mental health emergencies versus physical health emergencies.

67.    These officials disregarded the risk that results from sending police response teams to mental health emergencies, rather than mental health clinicians or other medical providers, who are more reliably trained to deal with mental health emergencies.

68.     The United States Department of Justice has found in multiple investigations that municipalities violate the Americans with Disabilities Act (ADA) by relying on police as the primary responders for addressing mental health emergencies.

69.     The Gwinnett County Police Department leadership was aware of these findings but did not change their practices as a result.

70.     In 2021, Gwinnett County Police Department personnel advertised that GCPD's focus on mental health gives Gwinnett residents "security knowing that if they call 911 we have officers that are trained to get them to the right resources."

71.     Yet the Gwinnett County Police Department routinely failed to give Gwinnett residents experiencing a mental health crisis the right resources.

72.     Rather than sending mental health clinicians or other medical responders, Gwinnett County's dispatchers regularly send police officers, without relevant medical training or proper police training for mental health crises, who far too often exacerbate an ongoing mental health crisis.

73.     In the present case, Gwinnett County Police Department personnel exacerbated Dani Laubscher's mental health crisis.

74.     Gwinnett County Police Department personnel yelled conflicting commands from different places, thwarted apparently efficacious medical responses, pointed lights and weapons, threatened to "fucking shoot" them, tased Dani multiple times, and ultimately, shot and killed them.

### *Gwinnett Hires Generally Adequate Medical Personnel to Respond to Medical Emergencies—Other than Mental Health Emergencies*

75.     Gwinnett operates its own ambulances and emergency medical services, and it also contracts with private providers to ensure that there is an appropriate response time to medical emergencies, such as heart attacks, strokes, collisions, and other serious medical emergencies.

76.     Gwinnett County dispatch routinely sends adequate first responders to physical health emergencies in a matter of minutes.

77.     Gwinnett receives hundreds of calls a month for mental health crises, including potential suicides.

78.     As of April 2022, Gwinnett staffed one mental health response unit that was operated by one police officer and one licensed mental health clinician to provide responses to mental health emergencies to the entire county.

79.   Gwinnett leadership knew that this was a woefully inadequate response to the documented volume of mental health emergencies in the County.

80.   This unit did not operate around the clock, so there were many hours during each day that Gwinnett residents experiencing mental health crises could not receive adequate care.

81.   Gwinnett leadership knew that this single unit could not respond in time to emergencies, and, more often than not, could not respond at all.

82.   However, even during times that the mental health response unit was operating, the long response times rendered it largely ineffective.

83.   The unit was staffed out of headquarters in Lawrenceville yet was purported to offer services county-wide to the approximately 1 million people living in the County.

84.   In 2021, the lead officer for this unit, a corporal, admitted that the unit was not able to offer coverage for the entire county.

85.   Under best-case scenarios, the mental health unit could only reach an on-going mental health emergency in roughly half an hour for many areas within Gwinnett County.

86.   Physical health emergencies garner adequate responses in much shorter time periods.

87. Gwinnett County Police Department leadership were aware of the long response times for mental health emergencies, especially in comparison to the response times for physical health emergencies.

88. The difference in the amount of time that Gwinnett personnel respond to physical health versus mental health emergencies with appropriate medical personnel amounts to discrimination.

### *Gwinnett Response Policies Place Additional Response Hurdles on Gwinnett Residents Who Experience Mental Health Emergencies Amounting to Discrimination*

89. Gwinnett response policies place additional hurdles to receiving medical services on Gwinnett residents who experience mental health emergencies, rather than physical health emergencies.

90. In 2021, the only GCPD officer involved in providing mental health response services through GCPD's co-responder program, stated that this mental health response was available when officers on the scene contacted the co-responder unit and requested support.

91. By contrast, physical health emergencies did not require officers to contact medical services after they had arrived on the scene. Physical health care personnel were sent as a matter of course by dispatch.

92. GCPD's response policies unfairly place additional barriers on Gwinnett residents who face mental health emergencies from receiving

adequate medical care and these additional barriers result in additional delay.

93.     This difference in how Gwinnett policy dictates responses for physical health emergencies and mental health emergencies, and the resulting delay, amounts to discrimination against Gwinnett County residents with mental health disabilities.

### *Failures in Police Training Created Unreasonable Risks for Mentally Disabled Gwinnett Residents and Led to Dani's Death*

94.     Dani Laubscher's death was the result of predictable training failures in GCPD's officer training protocol.

95.     GCPD officers were not trained in crisis intervention despite being Gwinnett County's de facto system of first response for dealing with mental health emergencies.

96.     Crisis intervention training (CIT) is standard for other jurisdictions that are similar to Gwinnett.

97.     CIT training is a widely recognized and adopted law-enforcement training that has been available from the State of Georgia at all relevant times. The CIT program, implemented by the State of Georgia in 2006, is sponsored by the National Alliance on Mental Illness, Georgia Department of Human Resources Division of Mental Health, Developmental Disabilities and

Addictive Diseases, Georgia Bureau of Investigation, Georgia Association of Chiefs of Police, Georgia's Sheriff's Association, Inc., and Georgia Public Safety Training Center.

98.    The State of Georgia's CIT Manual outlines a 40-hour course that teaches officers how to recognize and de-escalate mental health crises.

99.    CIT's mission is to "equip Georgia law enforcement officers with the skills to assist those with mental illnesses and other brain disorders in crisis, thereby advancing public safety and reducing stigma." Brain disorders may include mental illness, developmental disability, or addictive disease.

100.   One of CIT's objectives is to "Protect the rights of people with mental illness and other brain disorders."

101.   The CIT Mission and Policy Statement recognizes that the Americans with Disabilities Act("ADA") "mandates that law enforcement agencies and personnel make reasonable adjustments and modifications in their policies, practices, or procedures on a case-by-case basis. For example, when a person exhibiting symptoms of a brain disorder presents or expresses that he or she has a specific brain disorder or requests accommodations, officers and caretakers may need to modify routine practices and procedures and dedicate more time or exercise more sensitivity to extend the services or protections that be extended to someone else in a similar circumstance".

102.   A major goal of CIT training is to make encounters safer for police officers, as well as for individuals in mental health crisis.

103.   CIT implementation requires a department not just to train officers, but also to support them with a 24-hour mobile response unit staffed by mental-health professionals.

104.   Gwinnett did not train its officers in CIT.

105.   Gwinnett did not support them with a 24-hour mobile response unit staffed by mental health professionals.

106.   The Board of Commissions and GCPD leadership knew that creating a system where untrained GCPD officers served as the primary response to mental health emergencies would lead to dangerous situations for Gwinnett's mentally disabled residents.

107.   The Board of Commissions and GCPD leadership disregarded this risk.

108.   Dani's death resulted from Gwinnett's disregard for this risk.

109.   Gwinnett leadership, to include the Board of Commissioners and the leadership of GCPD acknowledged a need for change when they set up an understaffed and grossly inadequate single unit for mental health responses.

110.   But Gwinnett leadership knew this response was woefully inadequate to respond to the scope of mental health calls received.

111.   Only one team of two existed in the County when Dani Laubscher was killed.

112.   The Gwinnett County Sheriff's Office does not provide general law enforcement services in the County, as a matter of course, because that this GCPD's role.

113.   But the Sheriff's Office formed a mental health task force earlier than GCPD that was more robust than the GCPD equivalent.

### *Gwinnett's Personnel Were Unaware of Any Crime in Progress But GCPD Blocked Any Medical Response to the Health Crisis*

114.   Defendant's personnel were made aware of a "psych suicide" call by dispatch, but they did not observe any actions by Dani giving rise to probable cause for any offense.

115.   Gwinnett fire personnel, who unlike Gwinnett County Police Department personnel, are trained as emergency medical technicians were the first to enter the Laubscher home.

116.   When they entered the home, Dani Laubscher did not appear to be imminently suicidal.

117.   Gwinnett fire personnel began to administer emergency mental health care to Dani Laubscher.

118.   Gwinnett fire personnel did so by speaking calmly, and quietly, with Dani Laubscher.

119.   Gwinnett fire personnel told Dani Laubscher, "I'm here to help."

120.   Deborah Laubscher exited the home, while Dani stayed inside.

### *Gwinnett's Policies Escalated the Situation Until GCPD Used Unlawful Deadly Force*

121.   The response by Gwinnett law enforcement officers was to thwart fire personnel's medical response to the mental health emergency.

122.   Gwinnett law enforcement repeatedly yelled commands for fire personnel to disengage with Dani Laubscher.

123.    GCPD officer Kevin Mendez arrived after fire personnel and the first law enforcement officer.

124.    Mendez had no crisis intervention training, no medical training, and no mental health training.

125.   Mendez installed himself as the de facto leader of the group of first responders and enacted extant Gwinnett policy, or, alternatively, was delegated final policymaking authority, for Defendant's policy mandating that law enforcement responses to calls for mental health issues, even in the absence of known facts of criminality, take precedence over health-based responses.

126.   Mendez's approach, demeanor, and tactics were the opposite of the prior first responders and immediately escalated the situation.

127.   When Mendez walked through the front door, the first officer on the scene was closest to Dani Laubscher who remained at the top of the stairs.

128.   That officer was engaged with Dani.

129.   Mendez immediately demanded that the first officer use his taser on Dani Laubscher.

130.   The officer explained to Mendez that Dani Laubscher would fall dangerously if he used the taser, and, for at least that reason, he did not want to do so.

131.   There was not an immediate need to use a taser or other force.

132.   Mendez repeated to Dani that they would be tased.

133.   Mendez raised his voice above the first officer, when reasonable accommodations and proper training provide that only one officer should communicate and that officers should be calm and subdued.

134.   Mendez pulled his gun out, pointed it at Dani, and flashed the light from his gun onto Dani.

135.   This is contrary to reasonable accommodations and proper training.

136.   A third law enforcement officer arrived.

137.   The third officer deployed his taser on Dani.

138.   Tasers, used with the prongs, operate via neuromuscular incapacitation, meaning that a tased person loses the ability to control their body.

139.   At this point, one of the firefighters and the first law enforcement officer began to subdue Dani.

140.   Mendez further escalated the situation by preventing fire and other emergency personnel from resolving the situation short of using deadly force.

141.   Mendez, with his gun pointed at the first officer, firefighter, and Dani, ordered them to release Dani.

142.   Mendez yelled, "Let him go! Let him go!"

143.   Mendez physically pulled the firefighter who had Dani subdued, or was in the process of subduing Dani, off of Dani.

144.   The firefighter believed that they could resolve the situation, so they ignored Mendez's efforts to prevent them from subduing Dani.

145.   The firefighter then wrestled Dani so that Dani was face down on the ground with the larger firefighter on top of Dani, with other personnel standing by to assist.

146.   Again, Mendez, with his gun in one hand, used his other hand to pull the firefighter off of a subdued Dani.

147.   Mendez yelled, "I'm going to fucking shoot you!" with his gun aimed at the back of Dani's head while Dani was facedown.

148.   Other first responders yelled back to Mendez, "Do not shoot!"

149.   Another yelled, "Don't shoot! Don't shoot!"

150.   The firefighters left the house, perhaps because they were concerned Mendez was out of control and was going to shoot them or because Mendez's actions had allowed Dani to stand up in closer proximity to the first responders than before.

151.   Mendez asked the first officer to taser Dani.

152.   That officer did so successfully, again bringing Dani to the ground because of neuromuscular incapacitation.

153.   Mendez then ordered personnel to do the exact opposite of what he had just told them, and physically prevented them, from doing.

154.   As Dani began to sit up from a fully prone position, Mendez shot them from close range in the chest.

155.   At no point did Dani make any threatening motion or reach for anyone's weapon.

156.   At no time did Dani try to hurt themself.

157.   The initiating radio call was for a "psych suicide." The goal was that Dani was protected.

158.   Gwinnett personnel escalated the situation to a crisis point where a taser was deployed.

159.   Gwinnett personnel then prevented others from resolving the crisis by the provision of any medical care or by any means other than force.

160.   Gwinnett personnel shot and killed Dani when Dani had not attempted to do anything to anyone.

### GCPD Officers Failed to Accommodate Dani's Disability Leading to Dani's Death

161.   Dani Laubscher's death was the result of Gwinnett personnel failing to accommodate their disability on April 30, 2022.

162.   Dani Laubscher was experiencing a mental health crisis.

163.   Deborah Laubscher called 911 and specifically requested a mental health crisis unit assist her with Dani's mental health crisis.

164.   A mental health crisis team never arrived.

165.   Instead, GCPD officers arrived and thwarted a medical response to the medical emergency from proceeding.

166.   There is a vast array of de-escalation techniques that Gwinnett personnel could have used to accommodate Dani's disability.

167.   The use of de-escalation techniques has been shown to improve officer safety and decrease the likelihood of injury or death to an arrestee who is suffering a mental health crisis.

168.   Gwinnett personnel failed to utilize any de-escalation techniques.

169.   Gwinnett personnel surrounded Dani and shouted commands at them.

170.   The International Association of Chiefs of Police suggest speaking slowly, calmly, and using a low tone of voice when dealing with someone experiencing a mental health crisis.

171.   GCPD personnel pointed weapons at Dani.

172.   Evidence demonstrate that pointing weapons at a person experiencing a mental health crisis is likely to exacerbate the situation.

173.   Gwinnett personnel never attempted to contact the mental health response unit.

174.   Gwinnett personnel never attempted to create distance between themselves and Dani.

175.   Several policing organizations recognize that creating distance and trying to slow things down at the scene are essential for appropriately responding to a person undergoing a mental health crisis.

176.   Gwinnett personnel failed to implement any strategies or responses to create distance or time.

177.   GCPD officers tased Dani causing them to fall down the stairs, further reducing the distance between GCPD officers and Dani.

178.   At this point, GCPD officers continued to escalate the situation by yelling conflicting commands and threatening to kill Dani.

179.   Gwinnett personnel failed to accommodate Dani's disability by deciding against utilizing any reasonable de-escalation tactics.

180.   Gwinnett personnel could have permitted trained EMTs on scene to address the medical emergency.

181.   Gwinnett personnel could have used effective communication techniques for persons experiencing mental health crises, rather than repeatedly yelling conflicting commands.

182.   Gwinnett personnel could have kept their distance or simply waited outside the home for a more opportune moment to intervene.

183.   Gwinnett personnel could have retreated from the entryway of the home or attempted to contact Dani on the phone.

184.   Gwinnett personnel could have reached Dani's mental health provider by phone.

185.   Gwinnett personnel could have called for and/or bought time in order for better trained personnel to arrive.

186.   Gwinnett personnel could have called for and/or bought time in order for specialized medical personnel to arrive.

187.   Gwinnett personnel could have called for and/or bought time in order for a specialized mental health unit to arrive.

188.   Gwinnett personnel could have called for and/or bought time in order for a crisis intervention team to arrive.

189.   Gwinnett personnel could have called for and/or bought time in order for trained negotiators to arrive.

190.   Gwinnett personnel could have called for and/or bought time in order for specialized equipment to arrive.

191.   Gwinnett personnel unlawfully failed to provide these reasonable and readily available accommodations.

192.   Had Gwinnett personnel provided *any* of these reasonable accommodations, Dani Laubscher would still be alive.

## COUNT I
### *Title II of the ADA, 42 U.S.C. § 12131, et seq.*

193.   At the relevant time Dani Laubscher was a qualified individual with a disability protected by the Americans with Disabilities Act ("ADA") *see*

42 U.S.C. §§ 12102, 12131(2). Dani suffered from schizoaffective disorder, which is a disability within the meaning of the ADA.

194.   Gwinnett County is a local government and, therefore, a public entity subject to Title II of the ADA.

195.   Gwinnett County operates the emergency services dispatching system, mental health care, ambulance services, and police force for the County.

196.   Under the ADA, public entities are responsible for the discriminatory actions of their employees.

197.   Gwinnett County denied Dani Laubscher the benefits of these services and subjected them to unlawful discrimination by, among other things, failing to accommodate their disability by failing to dispatch medical services, failing to provide for the timely response of mental health providers, failing to allow the medically trained responders to provide a medical response, systematically treating mental health symptomology as a crime, failing to implement de-escalation or crisis intervention techniques, and failing to provide effective communication.

198.   Gwinnett County was aware that its existing policies and practices made it substantially likely that disabled individuals would be denied their federally protected rights under the ADA in mental health crises

and acted with deliberate indifference in failing to prevent or mitigate the denial of those rights.

199.   The following Gwinnett County officials, among others, had actual knowledge of Defendant's failures to accommodate and modify and unlawful discrimination but failed to adequately take corrective measures:

i. Kevin Mendez, who was the de facto leader of the group of first responders and enacted extant Gwinnett policy, or, alternatively, was delegated final policymaking authority for Defendant's policy mandating that law enforcement responses to calls for mental health issues, even in the absence of known facts of criminality, take precedence over health-based responses.

ii. James McClure, a career long Gwinnett County Police Department officer appointed to be Chief of Police in 2021, who knew that his officers were the de facto mental health responders for the County, but failed to train his officers in the basics of crisis intervention, de-escalation, tactical disengagement, or effective communication, and further failed to train officers that mental health symptomology is not a crime, that when health care providers are present they should be permitted to provide health care, or that use of deadly force to prevent possible suicide is, at

best, irrational. Chief McClure further failed to adequately staff and support crisis intervention teams, behavioral health units, or sufficient persons licensed in mental health care.

iii. GCPD leadership, to include Steve Shaw, Chris Smith, Everett Spellman, and Chris Long had the same knowledge as Chief McClure and, with McClure, failed to initiate sufficient responses to end discrimination on the basis of disability.

iv. The Gwinnett County Board of Commissioners, to include Chairwoman Nicole Love Hendrickson, District 1 Commissioner Kirkland Carden, District 2 Commissioner Ben Ku, District 3 Commissioner Jasper Watkins, III, and District 4 Commissioner Marlene Fosque. The Board was aware that law enforcement was the primary response to mental health crises rather than medical personnel, that the response time for medical professionals to mental health calls was significantly longer than for any other type of medical emergency, that law enforcement systematically treated mental health symptomology as a crime, that law enforcement interfered with the provision of medical care to persons experiencing mental health crises and otherwise exacerbated the situation, that police officers were not trained in

crisis intervention techniques, that the GCPD's crisis intervention

team and behavioral health teams were so understaffed as to be

unable to provide any response to the large number of suicide calls

dispatch received.

200.   The fatal shooting of Dani Laubscher was a direct and proximate

result of the County's violations of Title II of the ADA.

201.   The County is liable for the damages alleged in an amount to be

determined at trial.

## COUNT II
### *Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et seq.*

202.   Gwinnett County, including its emergency dispatch, police

department, and emergency medical responders, receive federal funding and

are subject to the Rehabilitation Act.

203.   Dani Laubscher was, at the relevant time, a qualified individual

with a disability.

204.   Acting with deliberate indifference to Dani Laubscher's federal

rights, the County failed to reasonably accommodate their disability; denied

them access to the services, programs, or activities of the County on the basis

of disability; and/or otherwise discriminated against them on the basis of

disability.

205.   The fatal shooting of Dani Laubscher was a direct and proximate result of the County's violations of the Rehabilitation Act.

206.   The County is liable for the damages hereinbefore alleged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests this Court:

a)  Hold a trial by jury on all issues so triable;

b)  Award nominal, compensatory, special, and punitive damages to Plaintiffs against Defendant in an amount to be proven at trial;

c)  Award Plaintiffs attorney fees under federal law;

d)  Tax all costs of this action against Defendant;

e)  Award any additional or alternative legal or equitable relief that is just and appropriate.

Respectfully submitted, this 30th day of April, 2024.

*/s/Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
Samantha Funt
Georgia Bar No. 943783

MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
Phone: 404-812-4747
Fax: 404-812-4740

zack@mitchellshapiro.com
sam@mitchellshapiro.com